UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL JARRETT,

        Plaintiff,

Case No. 1:13-cv-139

Hon. Gordon J. Quist

v.

BROOKE SNYDER, *et al.*,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendants Brooke Snyder, Jane Dykstra, Harold Gilkey, Nannette Norwood and Case Cheney's motion for summary judgment (docket no. 53) and plaintiff's motion for summary judgment directed at defendant Snyder (docket no. 70).

    **I.**    **Plaintiff's claims**

    **A.**    **Plaintiff's original complaint**

Plaintiff filed this action on February 8, 2013. *See* Compl. (docket no. 1). The gist of plaintiff's claim is that defendants removed him from his religious diet with a proper hearing. The Court previously summarized plaintiff's complaint as follows:

> Plaintiff Michael Jarrett presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Gus Harrison Correctional Facility, though the actions he complains of occurred while he was housed at the Ionia Maximum Correctional Facility (ICF). He sues ICF Assistant Resident Unit Supervisor Brooke Snyder and ICF Grievance Coordinator M. Breedlove.
>
> Plaintiff is a Buddhist who was approved for placement on a strict vegetarian diet while he was housed at the Richard A. Handlon Correctional Facility, probably in early 2011. On June 18, 2012, while he was housed at ICF, he was issued a Notice of Intent to Conduct an Administrative Hearing (NOI) as to whether he

should be removed from his religious diet. The NOI was issued based on a single email sent to Food Service Director G. Lewis, alleging that on March 16, 2012, Plaintiff and three other individuals were suspected of violating the restrictions of the diet policy by eating food from the main line. In preparation for the hearing, Plaintiff submitted a statement of his defense, including five questions to be asked and answered before the decision was made. Plaintiff did not receive a hearing and heard no more until August 3, 2012, when he was denied his religious meal by Food Service Supervisor J. Dykstra. When questioned, Dykstra informed Plaintiff that he was no longer authorized to receive a strict vegetarian diet. Plaintiff was shown a copy of a hearing report prepared by Defendant Snyder, stating that Snyder had conducted a hearing on August 2, 2012 and had removed Plaintiff from the diet.

Plaintiff spoke to Snyder, asking why she had fabricated the hearing report. Snyder told Plaintiff that she and Plaintiff had met in her office the day before to hold the hearing. Plaintiff denied the statement and sought assistance from supervisory staff, who took no action. He filed a grievance on August 3, 2012, alleging that he had been removed from his diet without a hearing. His grievance was given the number ICF 12/08/2995 28I, and it was rejected by Defendant Breedlove on the ground that he had failed to attempt to resolve the issue with staff prior to filing.

That same day, Plaintiff filed a second grievance, #ICF 12/08/2996 28A, in which he alleged that Defendant Snyder had compiled and circulated a false report of a hearing that she had not conducted. The grievance was denied at Step I because it raised duplicate issues.

On August 4, 2012, Plaintiff wrote a third grievance, #ICF 12/08/2994 07B, alleging that Defendant Snyder was discriminating against him. The grievance was rejected by Defendant Breedlove on August 22, 2012. After receiving the rejection, Plaintiff asked Breedlove for a grievance appeal form, which Breedlove denied on two occasions.

On August 28, 2012, Plaintiff was interviewed by Deputy Warden Norwood on one of the grievances. Plaintiff was not informed which grievance was in issue, but he assumed it was the last grievance, because it was the only one that had been given a title that did not indicate that it had been rejected.

Plaintiff then requested appeal forms for all three grievances. On September 11, 2012, Defendant Breedlove gave him appeal forms for three grievance numbers: ICF 12/08/2994 07 B, ICF 12/08/2995 9F, and ICF 12/08/2996 28A. Although he had not yet received responses on his grievances, Plaintiff appealed #ICF 12/08/2994 07B and #ICF 12/08/2996 28A. He received Step II responses on these grievances on October 16 and October 17, 2012.

2

On September 20, 2012, Plaintiff asked Breedlove about the disparity in the number on the remaining form, which referenced #ICF 12/08/2995 9F, rather than #ICF 12/08/2995 28A. Breedlove indicated that the number had been changed and that Plaintiff was to file the appeal of his first grievance under #ICF 12/08/2995 9F. Plaintiff appealed as instructed.

On September 20, 2012, Plaintiff received a grievance response from Deputy Warden Norwood, which alerted him to the fact that the numbers he had used on one of his grievances were incorrect. Plaintiff filed a grievance with the ICF inspector, #ICF 12/10/3420 28J, complaining that Breedlove's conduct demonstrated a willful attempt to disrupt the grievance process. The inspector rejected the grievance on October 18, 2012, because Plaintiff's proper remedy under the rules was to file an appeal of the grievance denial, not to file another grievance.

Plaintiff appealed his grievances to Step III. He has not received Step III responses in a timely fashion.

Plaintiff claims that Defendant Snyder's action in removing Plaintiff from his religious diet without a hearing violated his rights under the Due Process Clause and the First Amendment. He claims that Defendant Breedlove intentionally disrupted the grievance process and deprived him of his right to file a grievance under the MDOC grievance policy.

Opinion at pp. 2-4 (docket no. 4).[1]

Upon initial screening pursuant to 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c), the Court found that plaintiff's complaint failed to state a claim for relief against Grievance Coordinator Breedlove, dismissed him from this action and ordered that the complaint be served on Assistant Resident Unit Supervisor (ARUS) Snyder. *See id.* at pp. 1, 5-7; Order for partial dismissal and partial service (docket no. 5).

### B. Plaintiff's amended complaint

On November 14, 2013, the Court granted plaintiff's motion to amend his complaint, noting that "[p]ursuant to Fed. R. Civ. P. 15(a)(1)(A), plaintiff could amend his complaint 'as a

---

[1] Defendants incorrectly state that this case involves a kosher diet request, i,e, "[p]laintiff claims that he was removed from his kosher diet without receiving a proper hearing." Defendants' Brief at p. 1.

3

matter of course' without the need of a motion." Order (docket no. 33). Plaintiff's amended complaint (docket no. 34) named ARUS Snyder and four new defendants, Food Service Supervisor (FSS) Jane Dykstra, Resident Unit Manager (RUM) Harold Gilkey, Deputy Warden Nannette Norwood, and Chaplain Case Cheney. Amend. Compl. at ¶¶ 5-8.

The amended complaint contained the following allegations. ARUS Snyder violated plaintiff's Fourteenth Amendment due process rights and his First Amendment "Rights to Freedom of Religion" by removing plaintiff from his religiously based diet without conducting a hearing. *Id.* at ¶ 56. FSS Dykstra violated plaintiff's First Amendment right to freely exercise his religion by denying plaintiff his strict vegetarian lunch on August 3, 2012 "and every meal thereafter." *Id.* at ¶ 59. Deputy Warden Norwood and RUM Gilkey failed to act in their supervisory capacity "to curb the actions" of ARUS Snyder or "rectify" Snyder's unconstitutional actions "through the grievance process." *Id.* at ¶¶ 57-58. Finally, plaintiff Chaplain Cheney violated plaintiff's First Amendment Rights by refusing to interview plaintiff for the purpose of obtaining his religious diet. *Id.* at ¶¶ 40-44, 60. Plaintiff seeks among other relief, an injunction to reinstate his participation in the strict vegetarian diet line consistent with his religious beliefs and a transfer to the Macomb Correctional Facility which serves the strict vegetarian diet, and damages from the individual defendants. *Id.* at pp. 11-12.

## II. The parties' motions for summary judgment

### A. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468

U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, both plaintiff and defendants have moved for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

5

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Defendants' motion for summary judgment

Defendants seek summary judgment on two grounds. First, defendants contend that plaintiff did not properly exhaust any of his claims because plaintiff filed this action prior to receiving Step III responses to his grievances. Second, defendants contend that plaintiff did not properly exhaust his claims with respect to RUM Gilkey, FSS Dykstra, Deputy Warden Norwood, and Chaplain Cheney because his grievances did not name any of these defendants.

### 1. Exhaustion requirement

The Prison Litigation Reform Act of 1996 ("PLRA") provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

"Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. **Plaintiff failed to properly exhaust his claim**

#### a. **Plaintiff's grievances**

Plaintiff's amended complaint is based upon four grievances: ICF 12-08-2994-07b ("2994"); ICF 12-08-2995-28i (which was re-designated as ICF 12-08-2995-09f) ("2995"); ICF 12-

7

08-2996-28a ("2996"); and, ICF 12-10-3420-28j ("3420"). *See* Amend. Compl. at ¶¶ 21-23, 29 and 39; Plaintiff's Exhibits (docket no. 61-1); Defendants' Exhibits (docket no. 54-5). Grievance 2994 (incident date August 2, 2012), involved plaintiff's claim that ARUS Snyder revoked his religious diet without a hearing. *See* Grievance 2994 (docket no. 54-5 at p. 8). This grievance was reviewed by Deputy Warden Norwood and RUM Gilkey. *Id.* Grievance 2995 involved the same claim directed at ARUS Snyder, and was reviewed by Deputy Warden Norwood. *See* Grievance 2995 (docket no. 54-5 at p. 5). Grievance 2996 (incident date August 3, 2012), involved plaintiff's claim that ARUS Snyder falsified documents related to the hearing. *See* Grievance 2996 (docket no. 61-1 at p. 9). This grievance was reviewed by Deputy Warden Norwood. *Id.* Finally, Grievance 3420 (incident date September 19, 2012),involved plaintiff's claim against former defendant Grievance Coordinator Breedlove for hindering the grievance process. *See* Grievance 3420 (docket no. 54-5 at p. 30). This grievance was reviewed by Deputy Warden Norwood. *Id.*

      **b.**      **Chaplain Cheney**

In his response to defendants' motion for summary judgment, plaintiff concedes that "the exhaustion was not proper in regard to defendant Cheney." Plaintiff's Response at p. 6 (docket no. 61). Accordingly, Chaplain Cheney's motion for summary judgment should be granted.

      **c.**      **Genuine issues of material fact exist as to whether plaintiff improperly filed this action before he received Step III grievance responses from the MDOC**

Assuming that plaintiff's action involves the claims raised in all four grievances, there is no evidence that plaintiff exhausted these grievances until after he filed this action on February 8, 2013. Defendants have submitted an "MDOC Prisoner Step III Grievance Report" which indicates the following dates on which the Step III responses were mailed to plaintiff:

Grievance 2994 (February 28, 2013); Grievance 2995 (February 27, 2013); Grievance 2996 (May 22, 2013); and Grievance 3420 (April 8, 2013).  *See* Step III Grievance Report (docket no. 54-3). Indeed, plaintiff admits that he did not receive Step III responses prior to filing his complaint.  *See* Plaintiff's Response at p. 2.

The PLRA provides that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought.  *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741.  Thus, a prisoner "may not exhaust administrative remedies during the pendency of the federal suit."  *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir.1999).  Defendants contend that under the facts of this case, plaintiff did not properly exhaust his grievances, i.e., plaintiff filed his complaint before he received the Step III grievance responses.

Plaintiff justifies his failure to properly exhaust his grievances by stating that the MDOC failed to process his grievances in a timely manner, pointing out that he filed the lawsuit 189 days "after the first step I grievance was filed, 69 days after the time allotted for response due to the extension."  Plaintiff's Response at pp. 3-4 (docket no. 61).  Plaintiff relies on MDOC Policy Directive 03.02.130 ¶ S, which provides that:

> Grievances and grievance appeals at all steps shall be considered filed on the date sent by the grievant. The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing by the Grievance Coordinator at Step I and/or Step II. An extension for a Step I or II response shall not exceed 15 business days unless the grievance falls within the jurisdiction of the Internal Affairs Division. The Grievance Coordinator shall immediately notify the

grievant in writing whenever an extension has been approved; the extension also shall be noted in the grievance response.

Under the grievance scheme, the MDOC Policy Directives provide that its staff will issue a Step I response within 15 business days after receipt of the grievance and issue a Step II response within 15 days after receipt of the Step II grievance. MDOC Policy Directive 03.02.130 ¶¶ X and CC. In the event that MDOC staff does not provide the Step I or Step II responses within this time frame, MDOC Policy Directive 03.02.130 ¶ T allows the prisoner to proceed to the next step of the grievance process:

> If a grievant chooses to pursue a grievance which has not been responded to by staff within required time frames, including any extensions granted, the grievant may forward the grievance to the next step of the grievance process within ten business days after the response deadline expired, including any extensions which have been granted.

Unlike a Step I or Step II grievance, there is no specific deadline for providing a response to a Step III grievance. MDOC Policy Directive 03.02.130 ¶ GG provides:

> The Grievance and Appeals Section shall be the respondent for Step III grievances on behalf of the Director. Each grievance received at Step III, including those which may be rejected, shall be logged on a computerized grievance tracking system. The tracking system shall include information on the subject matter of each grievance received and, for rejected grievances, the basis for the rejection. The Grievance and Appeals Section shall forward grievances regarding health care issues to the Administrator of the Bureau of Health Care Services (BHCS). The BHCS Administrator shall ensure the grievance is investigated and a response provided to the Grievance and Appeals Section in a timely manner. The Manager of the Grievance and Appeals Section shall ensure that any additional investigation is completed as necessary for each Step III grievance accepted, including referral to the Internal Affairs Division and, for disability issues, to the Equal Employment Opportunity Office within the Bureau of Human Resources, as appropriate, and that a copy of the Step III response is provided to the grievant.

Thus, while MDOC Policy Directive 03.02.130 ¶ S contemplates that the entire grievance process is generally completed within 120 days, ¶ GG anticipates that additional

investigation may be required to resolve a grievance. Under plaintiff's theory, he did not need to wait until the MDOC provided a Step III response to "properly exhaust" a grievance. Rather, plaintiff contends that he simply needed to wait until the expiration of 120 calendar days after filing a Step I grievance to file a federal court action. *See* Plaintiff's Response at pp. 3-4 (docket no. 61). The undersigned respectfully declines to adopt the position that ¶ S requires the MDOC to finalize all grievances within 120 days. The MDOC's language, i.e., "[t]he total grievance process from the point of filing a Step I grievance to providing a Step III response *shall generally be completed* within 120 calendar days unless an extension has been approved in writing by the Grievance Coordinator at Step I and/or Step II" does not require that *all* grievances be resolved by providing a Step III within 120 calendar days (or up to 150 days with the two referenced 15-day extensions). The terminology in ¶ S is in the nature of a self-imposed completion goal, not a deadline.

However, while ¶ S does not authorize prisoners to file a federal action after a 120-day waiting period, neither does it grant the MDOC *carte blanche* to address grievances at their leisure or to indefinitely delay issuance of a Step III response. By failing to enact a coherent deadline for exhaustion of prisoner grievances, the MDOC has placed itself in the position of having to justify why it failed to issue a Step III response within the "general completion time" of 120 days. Because the MDOC has created this uncertainty with respect to exhaustion, the MDOC bears the burden of demonstrating why its response was not untimely under the framework set forth in ¶ S. *See Boyd v. Corrections Corporation of America*, 380 F.3d 989, 996 (6th Cir. 2004) (in a case arising in Tennessee, the Sixth Circuit stated that "[f]ollowing the lead of the four other circuits that have considered this issue, we conclude that administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance," citing with approval *Lewis v.*

*Washington*, 300 F.3d 829, 833 (7th Cir.2002) ("[w]e join the Eighth and Fifth circuits on this issue because we refuse to interpret the PLRA 'so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances.' ").

Allowing the MDOC an opportunity to provide an explanation for the manner in which it reviewed a particular grievance is consistent with the nature and purpose of administrative exhaustion. As the Supreme Court explained in *Woodford*:

> The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. The doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. Exhaustion of administrative remedies serves two main purposes.
>
> First, exhaustion protects administrative agency authority. Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures.
>
> Second, exhaustion promotes efficiency. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court. And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.
>
> \*   \*   \*
>
> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits). This Court has described the doctrine as follows: As a general rule . . . courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice. Proper exhaustion demands compliance with an agency's

>  deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Woodford*, 548 U.S. at 88-91 (internal citations, brackets and quotation marks omitted) (emphasis in original).

Here, the record reflects that the MDOC did not respond to any of plaintiff's grievances within 120 calendar days: Grievance No. 2995 filed on August 3, 2012, Step III response received on February 27, 2013 (208 calendar days); Grievance No. 2996 filed on August 3, 2012, Step III response received on May 22, 2013 (292 calendar days); Grievance No. 2994 filed on August 4, 2012, Step III response received on February 28, 2013 (208 calendar days); and Grievance No. 3420 filed on September 23, 2012, Step III response received on April 8, 2013 (197 calendar days).

When plaintiff filed this action on February 8, 2013, each of the grievances had been pending for more than 120 days: Grievance No. 2995 (189 days); Grievance No. 2996 (189 days); Grievance No. 2994 (188 days); and Grievance No. 3420 (138 days). Defendants have provided no explanation as to why the Step III responses were provided weeks or months after the 120-day general completion date set forth in ¶ S. Genuine issues of material fact exist with respect to whether the MDOC's treatment of these grievances was untimely. Accordingly, defendants' motion for summary judgment, based on plaintiff's filing of this action prior to his receipt of Step III grievance responses, should be denied.

> **d.     Plaintiff failed to properly exhaust his claims with respect to RUM Gilkey and Deputy Warden Norwood**

Newly-named defendants RUM Gilkey and Deputy Warden Norwood are entitled to summary judgment for lack of proper exhaustion. Policy Directive 03.02.130 ¶ R requires that

the "names of all those involved in the issue being grieved are to be included" in the grievance. Here, the relevant grievances, nos. 2994, 2995, 2996 and 3420, name only ARUS Snyder.

RUM Gilkey's name did not appear in Grievance No. 3420. While Grievance Nos. 2995 and 2996 mentioned RUM Gilkey, neither grievance was directed at Gilkey. In Grievance No. 2995, plaintiff stated that tried to resolve his grievance regarding ARUS Snyder by speaking to RUM Gilkey, who told plaintiff "that there was nothing he could do that can change what has already been done." In Grievance No. 2996, plaintiff stated that tried to resolve the grievance regarding ARUS Snyder by speaking with RUM Gilkey, who advised plaintiff to write a grievance. Finally, in Grievance No. 2994, RUM Gilkey was one of the respondents who denied plaintiff's grievance against ARUS Snyder. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the actual denial of a request to receive medical care).

Plaintiff did not direct any grievance against Deputy Warden Norwood. Norwood's only involvement was as one of the respondents who denied Grievance Nos. 2994, 2995, 2996 and 3420. Because Norwood only acted as a respondent who denied an administrative grievance, she cannot be liable under § 1983. *See Shehee*, 199 F.3d at 300; *Alder*, 73 Fed. Appx. at 841; *Martin*, 14 Fed. Appx. at 309.

Plaintiff has failed to properly exhaust any grievance against RUM Gilkey and Deputy Warden Norwood. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, defendants Gilkey and Norwood are entitled to summary judgment on this ground.

### e.   FSS Dykstra

FSS Dykstra seeks summary judgment because she is not named in any grievance. The Court disagrees. In Grievance No. 2996, plaintiff stated that on August 3, 2012, FSS Dykstra "produced a hearing report signed byARUS Snyder dated 8-2-12 that a hearing had been conducted." Grievance No. 2996 (docket no. 61-1 at p. 28). In this grievance, plaintiff complained that Dykstra played a role in preventing him from eating his religious diet. Based on this record, plaintiff has exhausted a claim against FSS Dykstra. Accordingly, defendant Dykstra's motion for summary judgment should be denied.

### C.   Plaintiff's motion for summary judgment

Plaintiff contends that he is entitled to summary judgment against ARUS Snyder. Defendants concede that the central issue raised in the motion is whether plaintiff was present at the August 2, 2012 administrative hearing where ARUS Snyder found him in violation of his religious diet. As discussed, genuine issues of material fact exist as to whether plaintiff exhausted his claim against ARUS Snyder. The existence of this factual dispute precludes plaintiff from prevailing on his motion for summary judgment against Snyder.

In addition, genuine issues of material fact exist with respect to whether ARUS Snyder properly removed plaintiff from his religious diet. Plaintiff relies on an affidavit filed in support of his motion for summary judgment which states that he filed a grievance claiming that ARUS Snyder "did not conduct any hearing prior to having me removed from my diet." *See*

15

Michael Jarrett Aff. (docket no. 71-1 at pp. 47- 49).  Plaintiff, however, does not make any affirmative statement in the affidavit that he was not present at the hearing or that ARUS Snyder failed to conduct a hearing.  *Id.*   It is unclear from the ARUS Snyder's Administrative Hearing Report as to whether plaintiff was physically present at the August 2, 2012 hearing.  *See* Hearing Report (docket nos. 71-1 at p. 20; 74-2 at pp. 2-3).  Furthermore, defendants have not filed an affidavit to clarify what occurred at that hearing.  Viewing the evidence in the light most favorable to the non-moving party (defendant), the Court concludes that genuine issues of material fact exist as to whether plaintiff was present at the August 2, 2012 hearing.  Accordingly, plaintiff's motion for summary judgment should be denied.

### III.     Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 53) be **GRANTED** as to RUM Gilkey, Deputy Warden Norwood and Chaplain Cheney, and **DENIED** as to ARUS Snyder and FSS Dykstra.

I further recommend that plaintiff's motion for summary judgment directed at ARUS Snyder (docket no. 70) be **DENIED**.

Dated:  August 20, 2014                          /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).